# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ELIZABETH MOCTEZUMA BAIRES
and WALTER A. BAIRES,

Plaintiffs,

v.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

Defendant.

Case No. 16-CV-402-JPS

**ORDER**

## 1.    INTRODUCTION

Plaintiff Elizabeth Moctezuma Baires ("Mrs. Baires") was injured in a car accident in September 2010. The other driver was underinsured. After his insurance company paid Baires what it could under its policy, Baires turned to her own insurance company, Defendant State Farm Mutual Automobile Insurance Company ("State Farm"). Her policy with State Farm included underinsured motorist ("UIM") benefits. In this action, she and her husband allege that State Farm failed to pay as required under the UIM policy. Plaintiffs bring three separate claims: (1) breach of contract; (2) loss of consortium; and (3) bad faith refusal to pay on Plaintiffs' claim.

This case was originally filed in Milwaukee County Circuit Court and was removed by State Farm on the basis of this Court's diversity jurisdiction. *See* 28 U.S.C. § 1332(a)(1). On December 5, 2016, State Farm filed a motion for partial summary judgment. (Docket #39). In it, State Farm requests that the Court dismiss Plaintiffs' bad-faith claim and dismiss their prayer for

prejudgment interest pursuant to Wis. Stat. § 628.46. The motion has been fully briefed and, for the reasons stated below, it will be granted.[1]

## 2.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The party opposing summary judgment "need not match the movant witness for witness, nor persuade the court that [his] case is convincing, [he] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

---

[1] In their response to State Farm's motion, Plaintiffs themselves request summary judgment on these issues. (Docket #47 at 19, 21). Plaintiffs' response was not filed until well after the dispositive motion deadline, and the Court will not consider Plaintiffs' belated and passing request for judgment in their favor. In any event, it would not matter if the Court treated Plaintiffs' request as timely, since it finds below that summary judgment is appropriate in State Farm's favor on the matters raised herein.

3.     **RELEVANT FACTS**

As noted above, Mrs. Baires was involved in a severe automobile accident with Eric Steele ("Steele") on September 2, 2010. (Docket #54 ¶¶ 8–10)[2]; (Docket #53 ¶¶ 1–5). Plaintiffs notified State Farm of the accident on September 3, 2010. (Docket #53 ¶ 6). After the accident, Mrs. Baires underwent physical therapy, cervical epidural injections, and other treatments. *Id.* ¶ 8.

The parties agree that the accident was Steele's fault. (Docket #54 ¶ 10). Steele was insured by American Family Mutual Insurance Company ("American Family") with a $100,000 policy. *Id.* ¶ 11. Plaintiffs brought an action in Wisconsin state court against Steele and American Family to recover damages for Mrs. Baires' injuries sustained in the accident. *Id.* ¶ 12.

Plaintiffs also had two insurance policies with State Farm in effect on the date of the accident. *Id.* ¶ 13. Each policy had a UIM limit of $100,000, and the policies stacked. *Id.* The total amount of UIM coverage for the accident, then, was $200,000. *Id.* ¶ 17. The terms of each policy were identical with respect to UIM coverage, so they will be treated as one policy for grammatical purposes. *Id.* ¶ 14. The policy provides, in relevant part, as follows:

> [State Farm] will pay compensatory damages for bodily injury an insured is legally entitled to recover from the owner or driver of an underinsured motor vehicle. The bodily injury must be:

---

[2]State Farm filed a reply in support of its statement of material facts. (Docket #54). The Local Rules do not contemplate a reply in support of the moving party's own statement of facts, *see* Civil L. R. 56(b)(3)(B), but Plaintiffs did not object to its filing and the document succinctly presents the parties' competing views of the record evidence. As a result, the Court will reference it here.

> 1. sustained by an insured, and
> 2. caused by an accident that involves the ownership, maintenance, or use of an underinsured motor vehicle as a motor vehicle.
>
> We will pay only if the full amount of all available limits of all bodily injury liability bonds, policies, and self-insurance plans that apply to the insured's bodily injury have been used up by payment of judgments or settlements, or have been offered to the insured in writing.

*Id.* ¶ 15.

In April 2014, State Farm received notice from Plaintiffs' attorney, Mark Thomsen ("Thomsen"), that American Family had offered the $100,000 limit of Steele's liability coverage to settle Plaintiffs' claims against Steele and American Family. *Id.* ¶ 18. A note in State Farm's claim file, written by State Farm employee Mary Medicus ("Medicus") on April 16, 2014, reads:

> Per recent correspondence in documents Elizabeth's specials w/ wage loss exceed $87,000 O/C AmFam has $100,000 BI limit C/V is a UIM as defined due to the 6949B endorsement. I see a brain scan was done—we will want to r/o the need for SIR. Please also address reserves. I note we've tiered the claim as a 3 as we learned of the UIM in conjunction w/ suit. I note that we have not been served with an amended summons for UIM yet.

(Docket #53 ¶ 12). Rae Lynn Kahle ("Kahle"), a State Farm auto claim representative, was assigned to handle Plaintiffs' claim. (Docket #54 ¶ 19). On April 17, 2014, Kahle wrote to Thomsen, acknowledging receipt of notice of American Family's settlement offer and providing State Farm's consent to the settlement. *Id.* ¶ 20. Plaintiffs' action against Steele and American Family was dismissed on September 5, 2014. *Id.* ¶ 22.

On May 12, 2014, State Farm received a demand letter from Thomsen, in which he demanded that State Farm pay the full $200,000 available under Plaintiffs' UIM policies. *Id.* ¶ 23. Attached to the letter were some of Mrs. Baires' pre- and post-accident medical records, post-accident healthcare bills, and other documents purporting to evidence costs to date of $430,860.61. *Id.* Also enclosed with the letter was a medical expert report authored by Michael McNett, M.D. ("Dr. McNett"), dated March 14, 2014. *Id.* ¶ 24.

Dr. McNett first saw Mrs. Baires on January 16, 2012, sixteen months after the accident. *Id.* ¶ 25. He diagnosed Mrs. Baires with cervical spinal stenosis and cervical radiculopathy. *Id.* ¶ 26. The report further stated that Mrs. Baires was reporting bilateral hand numbness. *Id.* Dr. McNett concluded that "there was at least some radiographic evidence for degenerative disc disease. . .prior to her accident" and that "there were some early signs possibly of right carpal tunnel syndrome prior to the accident." *Id.* ¶ 27. However, he attributed her current symptoms to the accident, noting that her post-accident symptoms "were clearly more significant, as indicated by the fact that she required multiple cervical epidurals and treated by a comprehensive pain clinic." *Id.* He found that the accident represented a "significant exacerbation of what was probably a mild problem prior to the accident." *Id.* Importantly, Dr. McNett believed that the aggravation of Mrs. Baires' symptoms caused by the accident would be permanent. *Id.* He opined that she would require as many as three cervical epidural injections per year, four doses of tramadol daily, quarterly visits with a physician, and at least eight physical therapy sessions per year. *Id.* ¶¶ 26–27; *see also* (Docket #53 ¶ 11). Based this report, Mrs. Baires claimed future medical expenses of $341,662.06, of which $223,314.30 was for future cervical epidural injections. (Docket #54 ¶ 31).

In July 2016, Dr. McNett drafted an updated report on Mrs. Baires' conditions and treatment. (Docket #53 ¶ 18). In March 2015, she returned to Dr. McNett, complaining of neck pain radiating to her left elbow. *Id.* He prescribed medication and physical therapy. *Id.* She was rechecked regularly after that time until as late as June 2016, but she continued to report pain and Dr. McNett continued to try different medications and other treatments. *Id.* Similar to the March 2014 report, Dr. McNett believed that although Mrs. Baires had suffered "minor neck problems" before the accident, the "dramatic worsening of symptoms starting very shortly after the incident and persisting to this day" meant that the accident caused a permanent aggravation of her neck problems. *Id.* He also noted that her "use of health care accelerated dramatically within a reasonably short time after the accident, which to me indicates that there was a significant worsening of her clinical condition following the accident." *Id.* ¶ 19; (Docket #48-10 51:13–25). He prescribed ongoing follow-up appointments with physicians, medications, and other treatments for Mrs. Baires' neck pain. (Docket #53 ¶ 19).

At his deposition in this case in October 2016, Dr. McNett expressed less certainty than in his earlier reports. He testified that he has no opinion as to whether the accident was a cause of Mrs. Baires' spinal stenosis, one of the two major conditions he identified in that report. (Docket #54 ¶ 29). Dr. McNett also acknowledged that his diagnosis of cervical radiculopathy was one about which reasonable medical experts could disagree. *Id.* ¶ 30.

Returning to the investigation timeline, on May 19, 2014, a week after receiving Thomsen's demand package, Cindy Boyer, another State Farm employee, documented in the claim file that Plaintiffs' demand has "claimed futures [that] exceed available coverage. I suggest setting up a stacking file. . . . Let's provide available coverage to the [insured's attorney]. I note

evaluation is in process." (Docket #53 ¶ 16). On June 21, 2014, Kahle noted in the claim file that she "reviewed all of the submitted medical bills and records for Elizabeth Baires. This was a significant impact which resulted in the DV rolling over." *Id.* ¶ 17. She also wrote that "[p]ast specials are nearly 84k with more than 35k of diagnostics and future treatment in excess of $341k." *Id.*

In light of Dr. McNett's March 2014 analysis and the records provided, Kahle determined that she needed to investigate further to determine what part of Mrs. Baires' symptoms were attributable to the accident and what part was the natural progression of her pre-existing conditions. (Docket #54 ¶ 32). To that end, she requested a recorded statement from Mrs. Baires and indicated that State Farm may want to obtain an examination of Mrs. Baires by its own physician. *Id.*[3] On July 28, 2014, Kahle requested that Medical Communications Corporation contact Thomsen to schedule an independent medical examination ("IME") of Mrs. Baires by an orthopedic spine specialist. *Id.* ¶ 33. This examination was conducted by Dr. Christopher Noonan ("Dr. Noonan") on September 12, 2014. *Id.* ¶ 34. Kahle had had no contact with Dr. Noonan prior to receiving his report of that examination, other than sending

---

[3]Plaintiffs question her motives, arguing that Kahle was not trying to determine how to fairly apportion the cause of Mrs. Baires' injuries but was instead looking for evidence on which to deny the claim. (Docket #54 ¶ 32). Yet Plaintiffs cite no evidence on this point, and without evidence to support a factual dispute about Kahle's motivations, the Court views Plaintiffs' statement as superfluous legal argument. *See Johnson v. Shiseki*, No. 08–C–471, 2010 WL 1287037, at *2 (E.D. Wis. Mar. 29, 2010) ("To the extent that an objection to a proposed finding of fact fails to cite specific evidentiary support, the objection has no weight. Moreover, if an objection is non-responsive to the proposed finding of fact, the objection does not create a dispute of fact. Similarly, arguments have no place in proposed findings of fact or responses to such findings.") (internal citations omitted).

the letter which transmitted some documents to Dr. Noonan and providing the questions she asked him to address. *Id.* ¶ 35.

On August 24, 2014, according to Plaintiffs, Kahle changed Mrs. Baires' injury evaluation from "Current [range of value ("ROV")] Low" to "Current ROV High" in the claim file. (Docket #53 ¶ 20). Plaintiffs offer this fact without much explanation. The Court gathers that these changes to the claim file, in Plaintiffs' view, represent Kahle increasing her valuation of the claim. Yet, as State Farm notes, the change log for the claim file only shows that a change was made to each of these fields, not that the "ROV High" figure replaced the "ROV Low." *Id.* The entries are unclear in this regard. *See* (Docket #48-8 at 27). Thus, it is not possible to discern that Kahle increased her valuation of Plaintiffs' claim solely on the ground that these changes were made to the claim file.

On August 28, 2014, State Farm sent Thomsen a check in the amount of $4,139.64. *Id.* at 10 ¶ 22.[4] This payment exhausted the $10,000 limit of Mrs. Baires' medical payments coverage from State Farm. *Id.* Plaintiff thus received a total of $110,000 in payments from insurance other than the State Farm UIM coverage as a result of the accident—American Family's $100,000 plus State Farm's $10,000 in medical payments coverage. *Id.* at ¶ 23.

State Farm received Dr. Noonan's report of his IME on October 7, 2014 and mailed Thomsen a copy the next day. *Id.* ¶ 36. Dr. Noonan did not agree with Dr. McNett's report. *Id.* ¶ 36.[5] Dr. Noonan opined that the accident was a contributing factor to "temporary aggravation of her underlying

---

[4]This paragraph number and the next were typographical errors by State Farm. The Court preserves them for the sake of clarity.

[5]This should be numbered paragraph 37, but the Court will again preserve State Farm's typographical error for consistency's sake.

degenerative changes at C5-6." *Id.* In particular, Dr. Noonan believed that Mrs. Baires' "condition was not caused by the accident, but appears to have been temporarily aggravated, accelerated and precipitated by the motor vehicle accident." *Id.* He concluded that Mrs. Baires had reached her healing plateau from the accident after six months, in April 2011. *Id.* Dr. Noonan attributed Mrs. Baires' complaints after April 2011 to her pre-existing degenerative cervical condition. *Id.* ¶ 38. He stated that "[t]he numbness she has into both upper extremities would be related to her carpal tunnel syndrome and not to the motor vehicle accident of September 2, 2010, as she certainly has no neural compressive lesion on her cervical MRI that would be causing the numbness." *Id.*

On October 10, 2014, Medicus wrote the following in the claim file:

> [Kahle] and I discussed at length. Roll over MVA with a physically and emotionally fragile insured. Four years of [treatment] including [chiropractic], [physical therapy], injections/pain management. Her pain specialist Dr. McNett acknowledges the related prior complaints, but concludes they were mild when compared to MVA [treatment]. He opines permanency with the need for significant future care. On the other hand, IME Dr. Noonan relates 6 months before attributing the remaining care as related to her pre-existing degeneration. We are not sure we have all of the prior records. [Kahle] will complete her evaluation attempting to balance both views and in consideration of the risks. [Insured's attorney's] firm is a competent, successful able litigators [sic]. If a pre-suit compromise can't be reached discovery will afford us a thorough review of records and NID's deposition. Whether she continues to treat will also be a factor.

(Docket #53 ¶ 21).

On December 1, 2014, Kahle requested from Medicus, her superior, authority of $50,000 to resolve Plaintiffs' claims. *Id.* ¶ 22. She arrived at this

figure by first evaluating the bodily injury damages a jury would likely award to Mrs. Baires. (Docket #45 ¶¶ 17–18). Based on Dr. Noonan's opinions, she estimated Mrs. Baires' damages to be $35,378.11 in healthcare costs and $10,000 in pain and suffering, for a total of $45,378.11. *Id.* That represented the low end of her damages range. *Id.* The high end, $160,504.13, was determined in part by valuing Mrs. Baires' to-date healthcare expenses with the assumption that the "aggravation" Dr. Noonan referred to persisted until May 2014. *Id.* Thus, Mrs. Baires' total damages, in Kahle's opinion, fell between $45,378.11 and $160,504.13. *Id.* She then subtracted what Mrs. Baires had already been paid—$110,000—to arrive at her compromise range, which was zero to approximately $50,000. *Id.*; (Docket #53 ¶ 22).

Also on December 1, 2014, Kahle discussed Dr. Noonan's report with Thomsen. (Docket #54 ¶ 39). She stated that the $110,000 that had already been paid had fully compensated Mrs. Baires for the injuries sustained as a result of the accident. (Docket #54 ¶ 39). Thomsen's response is not provided in the record, but it is clear that he disagreed with Kahle's assessment.

On December 2, 2014, Medicus granted Kahle the requested $50,000 in settlement authority. (Docket #53 ¶ 23). On January 6, 2015, Kahle extended a compromise offer of $5,000 to Thomsen by telephone. (Docket #54 ¶ 40). She sent him a letter on January 8, 2015, confirming the conversation. *Id.* ¶ 41. In it, she stated State Farm "believe[s] that a jury could find she has been fully compensated for this accident" since "[m]any of her complaints were present prior to the accident." *Id.* Nevertheless, she agreed to "increase [State Farm's] offer to $5,000.00." *Id.* On February 9, 2015, Thomsen made a counteroffer of $175,000. *Id.* ¶ 42. State Farm responded that same day with a counteroffer of $40,000, which Kahle confirmed in writing. *Id.* On February 18, 2015, Medicus commented in the claim file that "[t]here is no benefit to

advancing our current offer of $40k. . . . Rae will call [insured's attorney] and discuss. If [he] made a demand under $100k, we would consider recommending an increase in authority." (Docket #53 ¶ 24).

Thomsen did not respond to State Farm's $40,000 counteroffer until August 4, 2015. (Docket #54 ¶ 44). That day, he sent additional medical records and bills to State Farm and again demanded that State Farm pay the UIM policy limits of $200,000. *Id.* ¶ 45. Kahle informed Thomsen on September 3, 2015, that she would send the new information Thomsen provided to Dr. Noonan for his consideration and, once she received a response from the physician, she would then respond to Plaintiffs' renewed demand. *Id.* ¶ 46. She received Dr. Noonan's follow-up report, dated October 28, 2015, on November 11, 2015. *Id.* ¶ 47. She then noted in the claim file that "I recommend we provide a copy of the IME supplement report to the [insured's attorney] and reiterate our offer of $40k to resolve and stop there. [Insured's attorney] has never countered with a demand below limits." (Docket #53 ¶ 26). Kahle provided a copy of the report to Thomsen on November 13, 2015. (Docket #54 ¶ 47).

In the follow-up report, Dr. Noonan confirmed his opinion that, as a result of the accident, Mrs. Baires had sustained temporary aggravation of pre-existing degenerative changes to her cervical spine. *Id.* ¶ 48. Consequently, the follow-up report did not change Kahle's view that State Farm did not owe Plaintiffs any UIM benefits. *Id.* ¶ 49. Thomsen did not make any further attempts to negotiate a settlement. *Id.* at 17 ¶ 24. Instead, in a letter dated December 1, 2015, he demanded that State Farm pay the amount of its last offer, $40,000, or provide "a prompt reasonable explanation of the basis in the policy contract or applicable law for denial of [the Baires']

claim for UIM benefits." *Id.*; (Docket #53 ¶ 27). On December 24, 2015, Kahle wrote to Thomsen, explaining that (1) she was unaware of any law or contract provision requiring that State Farm provide advance payment of UIM benefits; and (2) no advance payment was available under State Farm's business practice as State Farm's initial offer was zero and because it was fairly debatable whether Mrs. Baires had been made whole by prior insurance payments. (Docket #54 ¶¶ 50–51). On February 5, 2016, Plaintiffs initiated this suit in Milwaukee County Circuit Court. (Docket #53 ¶ 28). On May 17, 2016, three months after this suit was filed, State Farm made an advance payment of $5,000 under the policy's UIM coverage. (Docket #54 ¶ 52).

It was State Farm's business practice that, for first-party UIM claims like Plaintiffs, where the parties reach a "bona fide impasse" in their compromise negotiations, State Farm will advance the initial compromise offer it had made. (Docket #53 ¶ 13); (Docket #48-5 41:20–24). According to Medicus, the initial compromise offer is an amount that State Farm knows it owes "without a doubt." (Docket #48-5 158:3–19). Of course, according to State Farm, its first "offer," made on December 1, 2014, was zero. *See* (Docket #53 ¶¶ 13, 25); (Docket #48-7 59:7–23). Plaintiffs disagree, arguing that the first offer was the $5,000 offered on January 6, 2015. (Docket #53 ¶ 25).

**4.    ANALYSIS**

Plaintiffs' bad-faith claim arises under Wisconsin law, and the Court, sitting in diversity, is obliged to apply that law to the claim. In Wisconsin, "every insurance contract has an implied duty of good faith and fair dealing between the insurer and insured." *Brethorst v. Allstate Prop. & Cas. Ins. Co.*, 798 N.W.2d 467, 475 (Wis. 2011). A claim for bad-faith refusal to pay a claim sounds in tort, rather than contract, and is "a separate intentional wrong, which results from a breach of duty imposed as a consequence of the

relationship established by contract." *Anderson v. Continental Ins. Co.*, 271 N.W.2d 368, 374 (Wis. 1978).

To prevail on a claim of bad faith in the insurance context, an insured must establish that (1) there was no reasonable basis for denying or delaying payment of the claim and (2) the insurer acted with knowledge or reckless disregard for the lack of a reasonable basis. *Id.* In determining whether there is evidence of a reasonable basis for denying a claim, courts examine whether a claim was investigated appropriately and whether the results of the investigation were evaluated and reviewed reasonably. *Id.* If an insured's claim is "fairly debatable" either in fact or law, then there existed a reasonable basis for denying the claim, and an insurer cannot have denied the claim in bad faith. *Id.* The Wisconsin Supreme Court has explained that "when a claim is 'fairly debatable,' the insurer is entitled to debate it, whether the debate concerns a matter of fact or law." *Id.* at 376. This is true even if the insurer ultimately loses on its argument that the claim should have been denied. *See Mills v. Regent Ins. Co.*, 449 N.W.2d 294, 298 (Wis. Ct. App. 1989).

Plaintiffs' bad-faith claim has several component parts, but whether considered alone or combination, they fall markedly short of establishing that State Farm's denial lacked a reasonable basis for denying their claim. The Court will address each part of Plaintiffs' theory in turn to demonstrate why none of them hold water.

### 4.1    Dr. Noonan's Opinion

First, Plaintiffs allege that State Farm could not reasonably have relied on the opinion of Dr. Noonan to deny their claim. (Docket #47 at 10–14). Their expert, Dr. McNett, believed that while Mrs. Baires had some pre-existing cervical spine problems, the accident permanently aggravated them. Dr. Noonan, by contrast, opined that the accident caused only a temporary

aggravation of those conditions. In his view, Mrs. Baires' ongoing healthcare needs are related mostly to the natural progression of her conditions, not the accident.

Without deciding which physician is correct, the Court concludes that Plaintiffs' evidence does not show that the extent and permanency of Mrs. Baires' injuries was beyond debate. Other than pointing to the opinion of their own expert, Plaintiffs do little to question Dr. Noonan's conclusions. Moreover, despite his conviction in the March 2014 and mid-2016 reports, Dr. McNett conceded at his deposition that reasonable physicians could disagree as to his cervical radiculopathy diagnosis and that he has no opinion about the cause of her spinal stenosis. Without a greater showing that Dr. Noonan was mistaken, the Court is obliged to conclude that the claim was fairly debatable. *Tripalin v. American Fam. Mut. Ins. Co.*, 880 N.W.2d 183, 2016 WL 1370129, at *3 (Wis. Ct. App. Apr. 7, 2016) ("[T]o establish a bad faith denial of coverage, [the plaintiff] would need to show that the opposing expert was so obviously wrong in his opinion that [the insurer] could not have reasonably relied on his opinion in its decision to deny coverage."). Further, it is of no moment that Mrs. Baires underwent extensive treatment after the accident; this alone does not definitively establish the causal relationship between the accident and Mrs. Baires' injuries, as Dr. Noonan's opinion demonstrates. *See Bushey v. Allstate Ins. Co.*, 670 A.2d 807, 810 (Vt. 1995) (even "voluminous" medical records from treating physicians opining on causation did not render it bad faith for the insurer to seek an independent evaluation to examine causation).

Nor does the record reveal that State Farm failed to adequately investigate and address Plaintiffs' views regarding Mrs. Baires' injuries. State Farm obtained Dr. Noonan's initial IME and discussed its implications with

Thomsen in light of Dr. McNett's competing report. When Plaintiffs pressed their demand in August 2015 by submitting new medical records, State Farm sent them to Dr. Noonan, who dutifully examined them and found that they did not change his opinion. There is, therefore, no reason in the record to suspect that State Farm failed to properly investigate and evaluate Plaintiffs' view on the matter before disagreeing with it. *Farmers Auto. Ins. Ass'n v. Union Pac. Ry. Co.*, 756 N.W.2d 461, 473 (Wis. Ct. App. 2008) ("[A]bsent an objectively unreasonable response to an insured's offer of settlement, we are left with a mere legitimate disagreement, which. . .is not enough to state a cause of action on the objective aspect of a bad-faith claim."); *Fehring v. Republic Ins. Co.*, 347 N.W.2d 595, 601 (Wis. 1984) (insurer flatly ignored insured's expert's analysis regarding extent of needed repairs to home), *overruled on other grounds*, *Dechant v. Monarch Life Ins. Co.*, 547 N.W.2d 592 (Wis. 1996); *see also Dahmen v. American Family Mut. Ins. Co.*, 635 N.W.2d 1, 3 (Wis. Ct. App. 2001) (insurer refused to provide "consultant" records it relied on to determine the extent of insured's injuries).

### 4.2    Investigation Delays

Plaintiffs also impugn State Farm's work ethic in investigating their claim. According to them, it was unreasonable for State Farm to cause the following delays: (1) one month between receiving Thomsen's first demand letter and arranging Dr. Noonan's IME—an IME which Plaintiffs believe was itself an unnecessary delay tactic; (2) four months between the IME evaluation and receiving Dr. Noonan's report; (3) two months after that to communicate to Plaintiffs on December 1, 2014, the denial of their claim; (4) an additional month before Kahle exercised any of the settlement authority she requested on December 1, 2014, and then only an initial offer of ten percent of the total authority, or $5,000; and (5) one more month before Kahle

offered $40,000 to compromise the claim—apparently the first reasonable action State Farm took in this whole process, according to Plaintiffs. (Docket #47 at 11–12).

These delays are not enough to permit an inference of bad faith. Conducting a thorough investigation takes time. While overlong or deliberate delays might, in part, contribute to a viable bad-faith claim, Plaintiffs offer no more than their own dissatisfaction with the timeline—a dissatisfaction that they never expressed during the course of the investigation—to support their allegations of impermissible delay. They also fail to mention that the single longest delay during the entire process was their own attorney's six-month delay in responding to State Farm's $40,000 compromise offer from February 2015.

State Farm's conduct is a far cry from that of the insurer in *Danner v. Auto-Owners Ins.*, 629 N.W.2d 159 (Wis. 2001), on which Plaintiffs principally rely. The insurer's egregious misconduct in that case afforded an ample body of evidence to support a finding of bad faith: it largely ignored evidence that the underinsured motorist was ninety percent at fault for the accident underlying the claim; it resisted the notion that the applicable policies stacked, although its attorney had no doubt on this point; and the insurer's doctor, who debated causation on the notion that the insured's injuries were pre-existing, was contradicted by three treating physicians' reports and was "so weak" in his conclusions that his report was likely not even admissible.[6]

---

[6]It should be noted that the case was appealed from a jury verdict in favor of the insureds, meaning that the Wisconsin Supreme Court was merely determining whether there was evidence from which the jury could have found bad faith, not for a *prima facie* showing thereof. *See Danner*, 629 N.W.2d at 162, 173–74.

*Id.* at 174–76. Wherever the threshold for bad faith lay, the insurer in *Danner* crossed it.

Plaintiffs focus on the timeline of *Danner*, apparently contending that it was the years-long investigation in that case which undergirded the bad-faith determination. (Docket #47 at 12–14). But reading *Danner*, it is hard to see how the pace of the investigation had much impact in light of the insurer's other conduct. The court did not expressly mention the delay as being probative on the bad-faith question. *Danner*, 629 N.W.2d at 174–76. Further, a comparison of comparable events in *Danner* and this case shows that none of the delays here came close to those experienced by the *Danner* plaintiff. Instead, Plaintiffs' challenge to the delays is largely idiosyncratic and does not support a finding of bad faith.

Additionally, Plaintiffs do no more than state that Dr. Noonan's IME was itself a delay tactic, without corroborating evidence. This Court is not ready to deny insurers the right, under appropriate circumstances, to seek an independent medical opinion when evaluating a claim. Indeed, in *Brethorst*, the plaintiffs included in their theory of bad faith the fact that the insurer in that case did *not* seek an IME before denying their claim. *Brethorst*, 798 N.W.2d at 472, 485. Here, State Farm did not wait until it was being sued to seek Dr. Noonan's advice, and the time it took to schedule the appointment and receive the report do not, standing alone, go so far as to show bad faith. *See Gentry v. State Farm Mut. Auto. Ins. Co.*, 726 F. Supp. 2d 1160 (E.D. Cal. 2010) (failure to obtain an IME to dispute the insured's claims of injury until a lawsuit was filed could show bad faith).

### 4.3    Admissions by State Farm Employees

Next, Plaintiffs believe that State Farm's employees recognized the extent of the damages Mrs. Baires sustained and willfully ignored them when

denying and compromising the claim. Plaintiffs appear to reference the various claims file notes in which Kahle, Medicus, and others wrote about Plaintiffs' claimed damages. These notes reflect Plaintiffs' valuation of the claim, not necessarily State Farm's agreement with the valuation. For example, the October 10, 2014 note written by Medicus includes statements about Dr. McNett's diagnosis and the competing report from Dr. Noonan, as well as analysis of how to proceed in light of the record as a whole at that time. The reflections of State Farm employees on the facts of the claim and the best strategic approach are not admissions of liability, such as those at issue in *Davis v. Allstate Ins. Co.*, 303 N.W.2d 596, 600 (Wis. 1981). In *Davis* the insurer had no evidence to contradict the insured's proof of the amount of loss, and its notes reflected that the employees knew the value of the claim, yet the claims adjuster decided to offer the insured less than a third of that amount, threatening drawn-out litigation as an alternative. *See id.* By contrast, here State Farm's employees investigated and considered Plaintiffs' claim, including their valuation and evidence, as well as State Farm's evidence, among other considerations, when evaluating the claim.

### 4.4 Failure to Advance Initial Compromise Offer

Finally, Plaintiffs assert that State Farm acted in bad faith when it refused to advance its January 6, 2015 compromise offer of $5,000. (Docket #47 at 2). Plaintiffs' theory is based on State Farm's business practice, which State Farm admits is to advance the amount of the initial compromise offer when it believes the parties have reached a "bona fide impasse." The parties do not dispute that they reached such an impasse in this case; rather, they dispute what the amount of State Farm's "first" offer was. State Farm says that its first offer was zero, since Kahle told Thomsen on December 1, 2014 that Mrs. Baires had been fully compensated by the $110,000 she had already

received. (Docket #41 at 22–23); (Docket #52 at 12). Plaintiffs, on the other hand, think that the first compromise offer was $5,000, the first actual amount of money offered to resolve the claim. (Docket #47 at 17–18).

More importantly, however, they dispute whether State Farm was required to advance a compromise offer in the first place. State Farm does not believe so, arguing that although its business practice was to advance an offer when an impasse occurred, it was not contractually obligated to do so under the policy. (Docket #41 at 22–23). Without making the threshold showing that its actions were a breach of the policy, State Farm reasons, Plaintiffs cannot maintain a bad-faith claim based on the failure to advance the compromise offer. Plaintiffs, however, believe that State Farm has an affirmative duty to settle claims, the violation of which can give rise to a bad-faith claim. (Docket #47 at 14–15). Moreover, Plaintiffs assert that State Farm knew "without a doubt" that it must advance the original offer—$5,000—so they can maintain a bad-faith claim for State Farm's failure to do so. *Id.* at 17.

State Farm has the better argument. The Wisconsin Supreme Court has held that "some breach of contract by an insurer is a fundamental prerequisite for a first-party bad faith claim against the insurer by the insured." *Brethorst*, 798 N.W.2d at 482. Although the court was careful to note that it does not "countenance bad behavior by insurers against their insureds," it nevertheless held that even "egregious conduct toward its insured" does not give rise to a bad-faith claim for coverage "that does not otherwise exist under the policy." *Id.* Doing otherwise would, in the court's view, untether the insurer's liability from the contract that forms the basis of its relationship with the insured. *Id.* The court explained that "the insurer's implied covenant of good faith and fair dealing arises out of the relationship created by the contract. If there is no contract, the insurer has no duty to act in good faith with respect

to a claim." *Id.* at 480. The court further found that allowing bad-faith claims without an underlying breach of contract would also "invite the filing of unmeritorious claims, focused on the insurer's alleged misconduct." *Id.* at 482. In sum, the court found that "[a]n insurer's bad behavior unrelated to a breach of contract might be subject to some sanction, but it does not warrant a first-party bad faith claim." *Id.* at 483.

*Brethorst*'s reasoning forecloses Plaintiffs' theory regarding State Farm's failure to advance its compromise offer, for they point to no provision in the policy that requires such an advance. *See LeFevre v. Westberry*, 590 So.2d 154, 162 (Ala. 1991) (bad faith claim cannot be premised on failure to advance UIM funds because advances are not required by the terms of the policy); *accord Voland v. Farmers Ins. Co. of Ariz.*, 943 P.2d 808, 814 (Ariz. Ct. App. 1997). Even if Plaintiffs are correct that State Farm knew "without a doubt" that it must, as a matter of internal procedure, advance the $5,000 it initially offered, this is not enough to support a bad-faith claim. Plaintiffs are not in privity of contract with State Farm's business practices. Its failure to follow those practices does not amount to "wrongful denial of some contracted-for benefit" under the policy. *Brethorst*, 798 N.W.2d at 480.[7]

---

[7] The actual holding of *Brethorst* concerned a slightly different scenario than that presented here. In that case, the court was concerned with whether a bad-faith claim could be maintained where the injury was ultimately determined to not be covered under the policy. *See Brethorst*, 798 N.W.2d at 479–80. The court answered "no," finding that a bad-faith claim cannot extend coverage where none exists. *Id.* at 482. By contrast, there is no dispute here that the September 2010 accident was covered under the UIM policy. The issue is instead whether, as part of its duty to investigate and evaluate claims in good faith, State Farm was also required to advance its initial settlement offer, something required only by its operating procedures and not by the policy itself. The Court finds that the extension of *Brethorst* to Plaintiffs' situation is straightforward.

*Alt v. American Family Mut. Ins. Co.*, 237 N.W.2d 706 (Wis. 1976), relied on by Plaintiffs, is inapposite. Underlying that suit was another case in which the defendant-insurer defended its insured from the claim of a third party. *Id.* at 708. The insurer failed to settle that underlying case, and the assignees of the insured brought an action against it for its bad-faith failure to do so. *Id.* The court, relying on *Hilker v. Western Automobile Ins. Co.*, 231 N.W. 257 (Wis. 1930), found that the plaintiffs could maintain a bad-faith claim in that instance, reasoning that in third-party excess liability cases, the insurer owed a fiduciary duty to the insured to investigate and settle claims where liability was clear. *Alt*, 237 N.W.2d at 711–12.

Plaintiffs' reliance on *Alt* is misplaced because they neglect the important distinction between third-party claims like that in *Alt* and *Hilker* and first-party claims like the one presented here. In third-party cases, the insurer defends the insured and has a duty to engage in good-faith settlement efforts to protect the insured. For a first-party claim like Plaintiffs', however, the relationship between insurer and insured is merely contractual. *Brethorst* makes this plain, noting that "[i]n circumstances like *Hilker*, the insurer's complete takeover of the insured's defense creates a quasi-fiduciary relationship. That relationship is different from the insurer-insured relationship in a first-party claim. In a first-party bad faith claim, the insured insists that the insurer wrongfully denied benefits or intentionally mishandled a legitimate claim for benefits." *Brethorst*, 798 N.W.2d at 479. State Farm's duty to settle first-party claims is not comparable to its duty to settle third-party claims. Thus, *Alt* is of no help to Plaintiffs.

Similarly, *Government Employees Ins. Co. v. Quine*, No. CIV–08–1140–C, 2009 WL 2497305 (W.D. Okla. Aug. 17, 2009), does not suggest Plaintiffs' preferred result. There, the court found that a bad-faith claim could rest on

the insurer's refusal to promptly pay the undisputed portion of a UIM claim. *Id.* at *2. Wisconsin courts also appear to take the view that failure to pay a clearly valid claim (or a clearly valid portion of a claim) can constitute bad faith. *See Danner*, 629 N.W.2d at 169–70; *Murphy ex rel. Schulz v. Cincinnati Ins. Co.*, 728 N.W.2d 374, 2007 WL 149119, at *4 (Wis. Ct. App. 2007). Yet here, State Farm contested that it owed Plaintiffs anything at all. Its settlement offer did not represent an admission that the claim or any portion of it was clearly valid; the offer was, like all settlement offers, simply a strategic decision to head off potential future liability. Thus, the $5,000 compromise offer did not represent the undisputed portion of Plaintiffs' claim, and State Farm was not required to pay it to avoid accusations of bad faith.

### 4.5    Pre-Judgment Interest Under Section 628.46

Because Plaintiffs' bad-faith claim will be dismissed, the Court must also dismiss their prayer for pre-judgment interest. Section 628.46 provides, in pertinent part, that an insurance claim is overdue if not paid within thirty days, unless the insurer has "reasonable proof to establish that [it] is not responsible for the payment." Wis. Stat. § 628.46(1). "Reasonable proof" here means evidence "sufficient to allow a reasonable insurer to conclude that it may not be responsible for payment of a claim." *Kontowicz v. Am. Standard Ins. Co.*, 714 N.W.2d 105, 117 (Wis. 2006). The Wisconsin Supreme Court has held that the "reasonable proof" standard is generally met where the claim is "fairly debatable." *Id.* Thus, because the Court has found that Plaintiffs' claim was fairly debatable, it must also conclude that there was reasonable proof showing that State Farm was not responsible for paying their claim, thereby eliminating the availability of statutory prejudgment interest. *See Manpower Inc. v. Ins. Co. of Pa.*, No. 08–C–0085, 2010 WL 3809695, at *5 (E.D.

Wis. Sept. 24, 2010) (dismissing prejudgment interest demand where bad-faith claim was also dismissed).

5. **CONCLUSION**

Plaintiffs' evidence of alleged bad faith does not pass the high bar required to show that State Farm lacked a reasonable basis on which to dispute and ultimately deny their claim. Thus, their bad-faith claim cannot go to the jury. Neither can their claim for pre-judgment interest, which is dependent on the survival of the bad-faith claim.

Accordingly,

**IT IS ORDERED** that Defendant State Farm's motion for partial summary judgment (Docket #39) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiffs' motion to seal documents (Docket #49) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that Count III of Plaintiffs' Amended Complaint and Plaintiffs' prayer for prejudgment interest pursuant to Wis. Stat. § 628.46 (Docket #15) be and the same are hereby **DISMISSED with prejudice**.

Dated at Milwaukee, Wisconsin, this 3rd day of February, 2017.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge